[Crim. No. 11964. In Bank. May 28, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. EDWIN C. S.
JOHNSON, Defendant and Appellant.

Robert Nareau, under appointment by the Supreme Court, and Young & Nareau for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Arnold O. Overoye, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK. J.—This appeal from a judgment of conviction of incest (Pen. Code. § 285) presents the important question whether section 1235 of the new Evidence Code, making prior inconsistent statements of a witness admissible *for the truth*

*of the matters therein asserted,* violates the Sixth Amendment's guarantee of the right of confrontation when introduced against a defendant in a criminal prosecution. We conclude that the statute cannot constitutionally be so applied, and that it was prejudicial error to do so in the case at bar.

The chronology of events is as follows: On February 7, 1964, defendant's wife and 15-year-old daughter Elaine appeared under subpoena before the Yolo County Grand Jury. Defendant, of course, was neither present in person nor by counsel. Elaine testified that defendant engaged in an act of sexual intercourse with her on January 11, 1964, and on a number of earlier occasions; Mrs. Johnson testified that at various times she was present when her husband and Elaine participated in sex play, and acts of intercourse could have taken place. The grand jury returned an indictment charging defendant with incest committed on January 11, 1964. He first entered a plea of guilty; after he had served some two years and eight months in prison, his plea was set aside by order of the federal district court because of constitutionally inadequate representation of counsel. Upon rearraignment defendant entered a plea of not guilty, and the cause went to trial in January 1967.

The prosecution's principal witnesses were to be Elaine and Mrs. Johnson. When called to the stand, however, both recanted and flatly denied that the alleged acts of sexual intercourse had taken place. In particular, Elaine testified that on January 11, 1964, defendant touched her breasts and private parts and she masturbated him, but that she did not engage in sexual intercourse with him on that or any other date. The prosecutor was then allowed to read, in the presence of the jury, those portions of the transcript of Elaine's testimony before the grand jury in which she asserted she had intercourse with defendant on the night in question and the prior occasions. Elaine testified that her grand jury testimony was not true, explaining that it was given when she was only 15 years old and under great emotional stress; that she had become angry at and afraid of defendant because he had severely beaten both her and her mother; that after defendant was arrested on a wife-beating charge the district attorney suggested to her that if she would "play our game" defendant would be committed to a psychiatric hospital for treatment, but if she refused, "he will come home and next time anything happens we are not going to help you."

On cross-examination Elaine testified that she had also

become incensed at defendant because in the previous November he had falsely accused her of being involved in a high school sex and narcotics ring, caused her to be physically examined by health authorities for evidence of such activities, and reported this alleged misconduct to the district attorney.

Over defendant's objection, the transcript of Elaine's testimony before the grand jury was admitted into evidence.

When Mrs. Johnson was called to the stand she testified that she had no knowledge of any sexual activities having occurred between defendant and Elaine. Again the prosecutor was allowed to read portions of the testimony given by Mrs. Johnson before the grand jury, in which she described both observing and participating in such activities. Mrs. Johnson testified that her grand jury testimony was not true, explaining that at the time she related it she harbored feelings of jealousy and vindictiveness towards defendant; that she believed he was in need of psychiatric treatment; that the district attorney advised her a simple wife-beating charge would not suffice to have defendant committed to a mental hospital, and "it would be necessary for me to show that my husband had committed an incestuous act with my daughter." She added that she had been reluctant to so testify but was repeatedly coached by the district attorney prior to the grand jury hearing, and that during the period of defendant's imprisonment on his invalid plea of guilty she frequently informed the authorities by affidavit that he had not in fact committed any acts of sexual intercourse with Elaine.

Pressed further, Mrs. Johnson conceded that another reason why she had wanted to have defendant removed from their home was her desire to pursue a budding illicit relationship with a certain family acquaintance, and that the beating she received from defendant on the night of January 15, 1964, was provoked by her admission of this clandestine affair. She acknowledged that she thereupon took refuge at the county receiving home managed by Mrs. Joanne Griffis, but her testimony as to whether she told Mrs. Griffis of any sexual misconduct by defendant was equivocal.[1] She further testified that the idea of accusing defendant of incest was planted in

---

[1] When asked several times if she had made an accusation of this nature to Mrs. Griffis, Mrs. Johnson responded with such answers as the following: "I don't remember. As I say, I was very overwrought. I don't remember what I said to her. I don't doubt that I said many things against him because I was feeling so vindictive and so hateful toward him. I would have said anything that night. I really can't remember what I specifically—what I did say to her."

her mind a few days later by Lieutenant Gorman, an investigator for the sheriff's office, who assertedly told her that defendant had made a confession of that crime.

Again over defendant's objection, the transcript of Mrs. Johnson's testimony before the grand jury was admitted into evidence.

Lieutenant Gorman then testified that at an interview on January 16, 1964, Elaine stated to him that she had engaged in sexual intercourse with defendant on January 11 and a number of earlier occasions. He further testified that at an interview on January 17, Mrs. Johnson stated to him that she had observed and participated in sexual activities involving Elaine and defendant. He denied telling Mrs. Johnson that defendant had confessed to the offense of incest.

Mrs. Griffis testified that during the night of January 15, 1964, Mrs. Johnson came to her home and said she had discovered that defendant and Elaine were having intimate relations, and that she herself had subsequently participated in such activities. According to Mrs. Griffis, Mrs. Johnson was in a bruised and frightened condition but appeared neither "vindictive" nor "hateful."

Finally, Thomas Purtell, who had been district attorney at the time of the events in question, testified that prior to the grand jury hearing he had numerous interviews with Mrs. Johnson and Elaine in which both gave him statements similar to their subsequent grand jury testimony. He denied making any suggestions that they testify falsely, or any promises that if defendant were convicted he would receive psychiatric treatment. He acknowledged, however, that throughout these interviews Mrs. Johnson displayed fear of defendant and a concern that he receive such treatment. Similar testimony was given by James Calloway, who had been Mr. Purtell's deputy during this period.

Section 1235 of the new Evidence Code, effective January 1, 1967, provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."[2] Section 1235 thus abrogates the formerly well-settled rule that a prior inconsistent statement of a witness is admissible only for the limited purpose of impeachment (e.g., *People v. Orcalles* (1948) 32 Cal.2d 562, 572-573 [197 P.2d 26]; *People v. Bal-*

---

[2]Section 770 merely requires that the witness be given an opportunity to explain or deny the prior statement at some point in the trial.

*lard* (1963) 218 Cal.App.2d 295, 309 [32 Cal.Rptr. 233]), and declares such a statement to be substantive evidence of the truth of the matters therein asserted. It is, in short, a new statutory exception to the hearsay rule.[3]

 The trial court ruled that section 1235 governed in this case, and instructed the jury that "testimony given by a witness at a prior proceeding has been read to you from the reporter's transcript of that proceeding. You are to consider such testimony in the same light and in accordance with the same rules which you have been given as to testimony of witnesses who have testified here in court." Although this instruction (CALJIC No. 37 (rev.)) was technically inapposite because it relates rather to the "former testimony" exception to the hearsay rule, it did serve to present the prosecution's theory that the grand jury testimony of Elaine and Mrs. Johnson was admissible for the truth of the matters therein asserted.[4]

Defendant contends that by authorizing the use of the prior inconsistent statements of Elaine and Mrs. Johnson as substantive evidence of his guilt, section 1235 deprived him of his right of confrontation guaranteed by the Sixth Amendment to the United States Constitution.[5]

We begin with *Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]. In that case a preliminary hearing was held at which one Phillips, chief witness for the prosecution, identified Pointer as the man who had robbed him at gunpoint; Pointer, for whom counsel had not been appointed, did not cross-examine. Phillips thereafter left the jurisdiction permanently, and at the trial for robbery the prosecution was allowed to introduce a transcript of his

---

[3]The Evidence Code also abolishes the requirement of a foundation (§ 769), and allows a party to impeach his own witness even though the latter's testimony was neither surprising nor damaging (§ 785; see also § 1235, comment of Law Revision Com.) In the present case there was in fact no surprise: it appears from the pretrial proceedings in chambers that the prosecutor expected Elaine and Mrs. Johnson to change their testimony, and the applicability of section 1235 was debated at that time.

[4]The instruction did not, of course, apply to their *extrajudicial* prior inconsistent statements reported by Lieutenant Gorman, Mrs. Griffis, Mr. Purtell and Mr. Calloway, but neither were the jury given any instruction (e.g., CALJIC No. 54-A) limiting such statements to impeachment purposes. It appears the trial court intended the quoted instruction to somehow cover both kinds of prior inconsistent statements introduced.

[5]"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . . " Penal Code section 686 similarly declares that "In a criminal action the defendant is entitled: . . . to be confronted with the witnesses against him, in the presence of the court. . . ."

former testimony as evidence against the defendant. Pointer's claim of a denial of his right of confrontation was rejected by the trial court on the ground, in part, that his physical presence at the preliminary hearing had provided him with "the opportunity of cross-examining" the witness if he so desired.

Reversing the judgment of conviction, the United States Supreme Court emphasized (at p. 405 of 380 U.S. [13 L.Ed.2d at p. 927]) that "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal," and accordingly declared (at p. 406 [13 L.Ed.2d at p. 927]) that the Sixth Amendment's guarantee of that right was enforceable against the states through the Fourteenth Amendment.

Turning to the facts before it, the high court held that Pointer's mere physical opportunity to undertake a cross-examination without the assistance of counsel was inadequate to satisfy the confrontation requirement. The court sharpened the distinction by reasoning (at p. 407 [13 L.Ed.2d at p. 928]) that "The case before us would be quite a different one had Phillips' statement been taken at a full-fledged hearing at which petitioner had been represented by counsel who had been given a complete and adequate opportunity to cross-examine." The court then held that "Because the transcript of Phillips' statement offered against petitioner at his trial had not been taken at a time and under circumstances affording petitioner through counsel an adequate opportunity to cross-examine Phillips," its introduction invalidated the conviction under the Sixth and Fourteenth Amendments. (Accord, *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074].)

In *Pointer* the challenged evidence was introduced under the "former testimony" exception to the hearsay rule. The statutes and cases dealing with that exception are persuasive guidelines for an appraisal of section 1235: once the primary condition for admitting such testimony in the subsequent trial has been met—unavoidable absence of the witness, in "former testimony" cases; inconsistency with present testimony, in section 1235 cases—the evidence may be considered by the jury for the truth of the matters therein asserted. Yet as *Pointer* demonstrates, such former testimony will nevertheless be excluded if the defendant was not afforded a constitu-

tionally "adequate" opportunity to cross-examine the declarant at the time the testimony was given.

This fundamental rule is embodied in our statutes. Former Penal Code section 686, subdivision 3, declared to be admissible any testimony given at a preliminary hearing or a former trial on the merits in the presence of a defendant "who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness. . . ." Applying this rule, testimony given at a preliminary hearing at which the defendant's counsel had cross-examined the witness "at considerable length and without obstacle or curtailment of the right" was held admissible in a subsequent trial in *People* v. *Dozier* (1965) 236 Cal.App.2d 94, 100-105 [45 Cal.Rptr. 770]. By contrast, testimony given at a preliminary hearing at which the defendant's right to cross-examine was restricted by an erroneous ruling was held inadmissible in *People* v. *Redston* (1956) 139 Cal.App.2d 485, 494-496 [293 P.2d 880]. And, *a fortiori*, we held in *People* v. *Hillery* (1965) 62 Cal.2d 692, 708 [44 Cal.Rptr. 30, 401 P.2d 382], that the transcript of statements made by a witness before a grand jury was inadmissible as "former testimony," since there had been no opportunity whatever to cross-examine at such a proceeding. The challenged testimony in the case before us, it will be remembered, was likewise elicited at a grand jury hearing from which defendant and his counsel were excluded.

The current statutory provisions in this regard are found in Evidence Code sections 1291 and 1292. Section 1291 makes former testimony admissible when offered against a person who was a party to the proceeding in which it was originally given. This was the preexisting rule, although it is now more broadly stated. Section 1292 creates a new exception, allowing the use of former testimony even against a person who was not a party to the earlier proceeding if the issue is such that the party at that proceeding "had the right and opportunity to cross-examine the declarant with an interest and motive similar to" that possessed by the party at the subsequent trial.

The important point for our purposes is that section 1292 is limited on its face to "a civil action." As the comment of the Assembly Committee on the Judiciary explains, "Section 1292 does not make former testimony admissible in a criminal case. This limitation preserves a right of a person accused of crime to confront and cross-examine the witnesses against him.

When a person's life or liberty is at stake—as it is in a criminal action—the defendant should not be compelled to rely on the fact that another person has had an opportunity to cross-examine the witness.'' This reasoning applies even more forcefully to the present case: from the standpoint of the right to cross-examine, defendant was simply not a ''party'' to the earlier (grand jury) proceeding. No one was present at that proceeding with ''an interest and motive'' similar to his, and no one had ''an opportunity to cross-examine the declarant.'' If section 1292 is inapplicable to criminal prosecutions for this reason, it would seem that section 1235 should be likewise excluded.

There remains, of course, a major distinction between ''former testimony'' cases and section 1235 cases: in the latter the declarant is also a witness available for cross-examination at the subsequent trial. Indeed, it is because of this availability that academic writers have long urged that prior inconsistent statements of a witness could be admitted for the truth of the matters therein asserted without violating the hearsay rule. (See, e.g., McCormick, Evidence (1954) § 39; 3 Wigmore, Evidence (3d ed. 1940) § 1018; Morgan, *The Hearsay Dangers and the Application of the Hearsay Concept* (1948) 62 Harv.L.Rev. 177, 192-196; Morgan, *The Law of Evidence, 1941-1945* (1946) 59 Harv.L.Rev. 481, 545-550; Uniform Rules of Evidence, rule 63(1); Model Code of Evidence, § 503(b).) Adopting this viewpoint, the draftsmen of section 1235 justify their new rule on the ground that it ''admits inconsistent statements of witnesses because the dangers against which the hearsay rule is designed to protect are largely nonexistent. The declarant is in court and may be examined and cross-examined in regard to his statements and their subject matter. . . .[6] The trier of fact has the declarant

---

[6] At this point a somewhat more speculative justification is also offered by the commission: ''In many cases, the inconsistent statement is more likely to be true than the testimony of the witness at the trial because it was made nearer in time to the matter to which it relates and is less likely to be influenced by the controversy that gave rise to the litigation.'' We have recognized that this argument is persuasive for the limited purpose of admitting an extrajudicial eyewitness identification as substantive evidence of identity. (*People* v. *Gould* (1960) 54 Cal.2d 621, 626 [7 Cal.Rptr. 273, 354 P.2d 865].) In that context the freshness of the witness' recollection is obviously crucial, for the in-court identification could well be the product of the extrajudicial identification. (See, e.g., *People* v. *Caruso* (1968) ante, p. 183 [65 Cal.Rptr. 366, 436 P.2d 336].)

In the case at bar identification is not in issue. Here it is urged that the early testimony was the product of anger and vengeance, and the later testimony more reflective and therefore more accurate.

before it and can observe his demeanor and the nature of his testimony as he denies or tries to explain away the inconsistency. Hence, it is in as good position to determine the truth or falsity of the prior statement as it is to determine the truth or falsity of the inconsistent testimony given in court." (Evid. Code, § 1235, comment of Law Revision Com.; cf. Evid. Code, § 1202, and comment thereto.)

We cannot share the optimism of this reasoning. As Maguire has candidly admitted, "many trial lawyers will have none of this. They say it is a professorial pipe-dream. They have in mind considerations of practical policy. . . ." (Maguire, Evidence: Common Sense and Common Law (1947) p. 59.) Perhaps the foremost practical objection to the academic approach is that it grossly underestimates the value of one of the characteristics which make cross-examination "the greatest legal engine ever invented for the discovery of truth." (5 Wigmore, *op. cit. supra,* at p. 29.) To assert that the dangers of hearsay are "largely nonexistent" when the declarant can be cross-examined at some later date, or to urge that such a cross-examination puts the later trier of fact in "as good a position" to judge the truth of the out-of-court statement as it is to judge contemporary trial testimony, is to disregard the critical importance of *timely* cross-examination.

■ It is the general rule that "Regularly, cross-examination should immediately follow direct examination. While it may be postponed by the court, this may not be done to the injury of the one having the right to cross-examine." (58 Am.Jur., Witnesses, § 665; cf. *People* v. *Manchetti* (1946) 29 Cal.2d 452, 461 [175 P.2d 533].) For the reason of this rule, we need look no further than Wigmore's emphasis on the fact that "the cross-examination *immediately succeeds* in time the direct examination. In this way the modification or the discredit produced by the facts extracted is more readily perceived by the tribunal. No interval of time elapses, to diminish or conceal their force." (Italics in original.) (5 Wigmore, *op. cit. supra,* at p. 34.) This practical truth is daily verified by trial lawyers, not one of whom would willingly postpone to both a later date and a different forum his right to cross-examine a witness against his client. (See generally, Friedman, Essentials of Cross-examination (Cont. Ed. Bar 1968); Stanbury, California Trial and Appellate Practice (1958) pp. 485-491.)

Virtually every court of the Anglo-American legal system has declined to adopt the academic position here under

discussion. (See cases collected in Note, 133 A.L.R. 1454 et seq.) In the leading case of *State* v. *Saporen* (1939) 205 Minn. 358 [285 N.W. 898, 900-901], the court reasoned: "The rule is well settled that the only office of impeaching testimony of this kind is to negative or neutralize the testimony to which it is directed. (It may also discredit the witness as such.) [Citations.] That is what Dean Wigmore calls the orthodox and 'universally maintained' rule of American decision law. Although approved in the first (§ 1018), it is disapproved in the second edition of Wigmore, Evidence (§ 1018). The disapproval of the learned author is put upon the ground that the impeached witness testifies finally under oath and subject to cross-examination. Hence, he concludes, 'The whole purpose of the Hearsay rule has been already satisfied,' and so 'there is nothing to prevent the tribunal from giving such testimonial credit to the extrajudicial statement as it may seem to deserve.'

"That, we submit with deference, is not enough to qualify the previous contradictory assertion as substantive evidence." After observing that the witness' oath does not solemnize his prior extrajudicial statement, the opinion turns to the alleged adequacy of the belated cross-examination of the witness: "The chief merit of cross examination is not that at some *future* time it gives the party opponent the right to dissect adverse testimony. Its principal virtue is in its *immediate* application of the testing process. Its strokes fall while the iron is hot. False testimony is apt to harden and become unyielding to the blows of truth in proportion as the witness has opportunity for reconsideration and influence by the suggestions of others, whose interest may be, and often is, to maintain falsehood rather than truth." (Italics added.)

The only contrary authority cited to us are decisions of the United States Court of Appeal for the Second Circuit. (*United States* v. *De Sisto* (2d Cir. 1964) 329 F.2d 929, 932-934, and cases cited; see also *United States* v. *Schwartz* (E.D.Pa. 1966) 252 F.Supp. 866; but see *United States* v. *Ploof* (2d Cir. 1963) 311 F.2d 544, 546.) We find in those opinions, however, no satisfactory explanation of how a belated opportunity to cross-examine a witness as to the truth of a prior inconsistent statement may be deemed "adequate."[7] The Second Circuit, moreover, appears to stand

---

[7] Thus in *De Sisto*, the leading Second Circuit case, the court emphasized that both grand jury testimony and testimony at a former trial are given under oath, and that the latter is also given subject to cross-

alone in, adopting the academic position. The Court of Appeals for the District of Columbia Circuit has expressly refused to follow *De Sisto* (*Byrd* v. *United States* (D.C.Cir. 1965) 342 F.2d 939, 940 [119 App.D..C 360]), and the other federal appellate courts also adhere to the orthodox rule (e.g., *Brooks* v. *United States* (10th Cir. 1962) 309 F.2d 580, 582; *United States* v. *Bernard* (7th Cir. 1961) 287 F.2d 715, 723; *Valentine* v. *United States* (5th Cir. 1959) 272 F.2d 777, 778; *Clifton* v. *United States* (4th Cir. 1955) 224 F.2d 329, 331; *United States* v. *Michener* (3d Cir. 1945) 152 F.2d 880, 884 fn. 3).

In a recent decision the Eighth Circuit once again took the occasion to reject the academic position: "This court has respectfully demonstrated this viewpoint to be 'acknowledged heterodoxy.' *Ellis* v. *United States,* 8 Cir., 138 F.2d 612, 617. The *Ellis* case was decided in 1943. Almost a quarter of a century later the empirical judgment of all courts, both state and federal, still follow the orthodox view, contrary to the liberal suggestions early espoused by Dean Wigmore. See 3 Wigmore, § 1018 (3rd ed. Supp. 1964). *The right to confront the witness at the time the statements are made is paramount in a criminal trial. U.S. Const. Amend. VI.*" (Italics added.) (*Goings* v. *United States* (8th Cir. 1967) 377 F.2d 753, 762 fn. 12.)

The emphasized language of the federal court focuses on the true issue before us. We do not here inquire, as a matter of the law of evidence, whether prior inconsistent statements of a witness should or should not be admitted as substantive proof. That disagreement between the academic community and the courts has been settled in this state by the Legislature's enactment of section 1235 of the Evidence Code, and we cannot review the wisdom of its solution. ■ "The power of the legislature to determine what is or is not competent evidence in civil or criminal cases is unquestionable." (*People* v. *Buckley* (1904) 143 Cal. 375, 393 [77 P. 169] (Beatty, C. J., concurring).)

But that power, while unquestionable, is not unlimited, and remains subject to the restrictions placed upon it .by the state

examination (p. 934 of 329 F.2d); but the opinion is silent on the fact that of these two, grand jury testimony is *not* subject to cross-examination. We further note that the actual holding in *De Sisto* was simply that an extrajudicial eyewitness identification is admissible as substantive evidence, a rule we declared in California four years earlier (see fn. 6, *ante*).

and federal Constitutions (*Miller & Lux* v. *Secara* (1924) 193 Cal. 755, 766 [227 P. 171].) ''The courts, as custodians of the judicial powers of government, are not obliged to enforce a statute which through a rule of evidence arbitrarily deprives a litigant of his rights, or which permits a defendant to suffer conviction without due process of law.'' (*People* v. *Murguia* (1936) 6 Cal.2d 190, 193 [57 P.2d 115].) Indeed, in recognition of this principle section 1204 of the Evidence Code declares that ''A statement that is otherwise admissible as hearsay evidence *is inadmissible against the defendant in a criminal action* if the statement was made, either by the defendant or by another, under such circumstances that it is inadmissible against the defendant under the Constitution of the United States or the State of California.'' (Italics added.) The typical case governed by the statute is that of an admission or confession of a defendant obtained by coercion or in violation of his right to counsel, but ''its principle is made applicable to all hearsay statements.'' (Evid. Code, § 1204, comment of Assembly Committee on Judiciary.)

 The issue, then, is whether the substantive use of the prior inconsistent statements of Elaine and Mrs. Johnson, although ''otherwise admissible'' under section 1235, violated the constitutional rights of this ''defendant in a criminal action.'' The United States Supreme Court has squarely stated that extrajudicial statements of a witness, while admissible for impeachment purposes, ''certainly would not be admissible in any criminal case as substantive evidence. [Citations.] So to hold would allow men to be convicted on unsworn testimony of witnesses—a practice which runs counter to the notions of fairness on which our legal system is founded.'' (Fns. omitted.) (*Bridges* v. *Wixon* (1945) 326 U.S. 135, 153-154 [89 L.Ed. 2103, 2114-2115, 65 S.Ct. 1443].)

Equally clear is the court's commitment to preserving an essential guarantee of such fairness—the right of cross-examination—against all encroachments, however innocuous they may seem on their face. Thus in *Greene* v. *McElroy* (1959) 360 U.S. 474, 496-497 [3 L.Ed.2d 1377, 1390-1391, 79 S.Ct. 1400], the court declared that while the individual's opportunity to demonstrate the untruth of the government's case against him ''is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons moti-

vated by malice, vindictiveness, intolerance, prejudice, or jealousy.[8] We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment. . . . This Court has been zealous to protect these rights from erosion.'' (Fn. omitted.) A recent example of such zeal is *Smith* v. *Illinois* (1968) 390 U.S. 129 [19 L.Ed.2d 956, 88 S.Ct. 748], in which the court struck down a state narcotics conviction for violation of the confrontation clause although the defendant's right to cross-examine the chief prosecution witness was neither denied nor delayed but was simply curtailed by the exclusion of questions asking the witness his name and address: ''To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.'' (*Id.* at p. 131 [19 L.Ed.2d at p. 959].) And here again the ''former testimony'' cases are instructive: even when that testimony was taken at a hearing in which the defendant had a complete and adequate opportunity to cross-examine with the assistance of counsel, the court has held that its introduction at a subsequent trial violates the constitutional right of confrontation if the witness' absence was due to the negligence of the prosecution in allowing his escape (*Motes* v. *United States* (1900) 178 U.S. 458, 471-474 [44 L.Ed. 1150, 20 S.Ct. 993]) or its failure to make a good faith effort to compel his attendance by various procedural means (*Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318]). In the latter decision the court observed (at p. 725 of 390 U.S. [20 L.Ed.2d at p. 260]) that ''The right of confrontation may not be dispensed with so lightly.''[9] These rulings emphasize the high

---

[8]It will be remembered that vindictiveness and jealousy were among the motives which, according to Elaine and Mrs. Johnson, impelled them to testify falsely against defendant at the grand jury hearing.

[9]The court also took the occasion to cast doubt on the widely held assumption that cross-examination at a preliminary hearing, as distinguished from a trial, is constitutionally adequate to permit subsequent use of the witness' direct testimony under the ''former testimony'' exception: ''Moreover, we would reach the same result on the facts of this case had petitioner's counsel actually cross-examined [the incriminating witness] at the preliminary hearing. . . . The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.'' (*Ibid.*) The function of the grand jury hearing, of course, is no less limited.

court's belief in the importance of ensuring the defendant's right to conduct his cross-examination before a *contemporaneous* trier of fact, i.e., before the same trier who sits in judgment on the truth of the witness' direct testimony as it is spoken from the stand. (See also *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].)

In the light of these decisions, can we say here that the Sixth Amendment is satisfied when the defendant's opportunity to conduct a cross-examination of the evidence against him is restricted to a time three years after the evidence was given and to a place in which it is judged by a wholly different tribunal? Does the superficial form of such an opportunity to cross-examine rise to the level of constitutional substance? In short, is that opportunity constitutionally "adequate"? We conclude that it is not. Evidence Code section 1235, when applied against a defendant in a criminal case, results in the kind of erosion of the right of cross-examination that neither the United States Supreme Court nor this court will countenance.

We turn, finally, to the question of prejudice. Had defendant been denied the right to cross-examine testimony given directly from the witness stand at his trial, the ruling would have been " 'constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' " (*Smith* v. *Illinois* (1968) *supra,* 390 U.S. 129, 131 [19 L.Ed.2d 956, 959, 88 S.Ct. 748], quoting from *Brookhart* v. *Janis* (1966) 384 U.S. 1, 3 [16 L.Ed.2d 314, 316, 86 S.Ct. 1245].) But we are dealing here with a witness' prior inconsistent statements, a category of evidence which may run the gamut from extremely damaging to trivial and insignificant. When such statements are introduced for their traditional purpose of impeaching the witness, they may have little effect on the guilt-determining process. Accordingly, the erroneous admission of such a statement as substantive evidence does not automatically deprive the defendant of a fair trial, and the conviction will be reversed only in those cases in which prejudice ensued.

Nevertheless the error is of federal constitutional dimensions, and hence the governing test of prejudice is that laid down in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. Applying that test, we find the People have not proved that the substantive use of the prior inconsistent statements here challenged was "harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at

p. 711].) Indeed, a clearer case of prejudice could not be imagined, for these statements constituted the *sole* evidence that an act of intercourse had taken place as charged.[10] Not surprisingly, it appears from the face of the record that the People's case presented considerable difficulty to the jury: they consumed many hours in deliberations, called for the transcripts of the grand jury testimony, and returned to the courtroom a number of times, evenly deadlocked, before they were able to reach a verdict. That the jury thus hesitated to convict a man of a serious crime on out-of-court testimony of this nature is a credit to their prudence and good sense.

Our disposition renders moot defendant's contention that section 1235 cannot constitutionally be applied to him on the additional ground of the ex post facto clause. Nor need we resolve certain other points raised in the briefs, as a retrial on the facts and law herein analyzed would be futile.

The judgment is reversed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied June 26, 1968.

---

[10]This void is not filled by Elaine's direct testimony that she participated in manual sex play with defendant on the night in question. That evidence was doubtless relevant to the issue of intent or disposition, but the jury were correctly instructed that defendant could be found guilty of incest only if he had actual sexual intercourse with Elaine. (Pen. Code, § 285.)