[Crim. No. 462.    Fifth Dist.    Oct. 7, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. MICHAEL SHERMAN HARRIS, Defendant and Appellant.

Donald B. Cantwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Roger E. Venturi, Gordon F. Bowley and Edward A. Hinz, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, Michael Sherman Harris, was accused of burglary in count I of the information and of receiving stolen property in count II. The jury found him guilty of burglary in the first degree as to the first charge, but not guilty of receiving stolen property.

The efforts of his counsel on appeal are concentrated on two contentions: (1) that the proof does not establish that the burglary was of the first degree, and (2) that the trial court committed prejudicial error by admitting the testimony given at the preliminary examination of an absent witness, William Strickland.

Counsel for the defendant does not argue that the evidence is not sufficient to justify the conviction of burglary. This position concerning the commission of the crime is fully justified by the evidence. As usually happens in burglary prosecutions, the state necessarily depended upon indirect evidence with respect to the guilt of the defendant, but the record is so convincing in this respect that there can be no real doubt that the jury was completely justified in concluding that Harris was guilty of burglary.

While mere unexplained possession of stolen property is not alone sufficient to justify conviction of burglary (*People* v. *Murphy,* 91 Cal.App. 53 [266 P. 374] ; *People* v. *Frahm,* 107 Cal.App. 253 [290 P. 678]), it is well established that the possession of recently stolen property is incriminating and in such circumstances there need be only slight corroboration tending to show a defendant's guilt to warrant conviction (*People* v. *DeLeon,* 236 Cal.App.2d 530, 533 [46 Cal.Rptr. 241] ; *People* v. *Citrino,* 46 Cal.2d 284, 288-289 [294 P.2d 32] ; *People* v. *McFarland,* 58 Cal.2d 748, 754 [26 Cal.Rptr. 473, 376 P.2d 449]). In this connection, the failure of the defendant to establish that he had honestly obtained the property in question is itself a strong circumstance tending to prove his

428

guilt. (*People* v. *DeLeon, supra,* 236 Cal.App.2d 530; *People* v. *Guerrero,* 247 Cal.App.2d 687 [56 Cal.Rptr. 7]; *People* v. *Davis,* 235 Cal.App.2d 214 [45 Cal.Rptr. 297]; *People* v. *Holquin,* 203 Cal.App.2d 485 [21 Cal.Rptr. 435]; *People* v. *Beverly,* 200 Cal.App.2d 119 [19 Cal.Rptr. 67]; *People* v. *Brown,* 187 Cal.App.2d 651 [9 Cal.Rptr. 836]; *People* v. *Lanza,* 186 Cal.App.2d 860 [9 Cal.Rptr. 161].)

In *People* v. *Holquin, supra,* 203 Cal.App.2d 485 at page 487, it was stated by the court: ''While mere possession of stolen property is not sufficient to connect the possessor with the commission of a burglary it is a circumstance which requires a reasonable explanation of how possession was acquired and that it was honestly obtained. Unsatisfactory or false explanation may be sufficient corroborative evidence to connect the possessor with the theft.''

That burglary was committed by someone was amply proven. A little 8-year-old girl, Ann Strickland, whose family were neighbors of Mr. Ballantyn, was given permission by him to enter his garage daily during his vacation, in order to feed the family cats. Late Friday afternoon of March 24, 1967, Ann went over to the Ballantyn house on her mission but came back home in a hurry. She told her father that she was afraid to go into the Ballantyn house because some of its doors were open. When the Ballantyns came home several days later, they saw at once that the house had been rifled; a clock had been taken from the wall, and various articles of personal property were missing; other objects were strewn about the floors and someone evidently had committed a burglary in the house.

The record shows, without question, that, within a few days after the crime, the appellant had possession of four guns which had been stolen from a closet in the Ballantyn house.

Mr. Ballantyn, as a witness, described the four guns which were stolen from his home as follows: the first two were a Mossberg .22 caliber rifle and a 250,3000 Savage rifle, which he recognized at the trial by the notches he had marked on the gun and which he said had been purchased by his father from the Outdoorsman Sport Shop of Idaho Falls, Idaho in 1951. The third gun was a Browning automatic .22 caliber rifle, which had been bought in 1964 from Lacque & Sons Sporting Goods Store in Modesto. Mr. Ballantyn had a sales receipt for the Browning .22 caliber rifle which listed the serial number as 3T75394. He was also able to identify the Browning rifle at the trial. The fourth gun stolen from the house was a 16

gauge Browning automatic; the butt plate was half broken where it had been set down rather roughly, and it was a shotgun made in Belgium in 1921-22.

Shortly after the commission of the theft, the defendant appeared at the home of Sidney Moore in Riverbank accompanied by several young men and sold him a total of six guns, including three described above, which had been stolen during the burglary. The sale was made in the presence of three Riverbank friends of Mr. Moore's, whose names were Odom, Mathers and Green; a bill of sale written out by Mr. Moore's wife was witnessed by his three friends. The guns were sold to Moore for $75 in cash.

Appellant failed satisfactorily to explain his possession of the stolen weapons. He took the stand in his own behalf and testified that he had traded a 1955 Mercury automobile, for which he had originally paid $125, to a man named Larry DeCamp for the seven guns. He said he did not know the exact address of Larry DeCamp and said that he was not well acquainted with him, but had only met him through a friend of his. There was no DeCamp at the trial, no bill of sale purporting to come from him, and apparently there had been no effort to bring him to the trial on behalf of the defendant. The appellant stated on the stand that he traded with DeCamp on the 29th day of March, which was some four days after he, in fact, sold the weapons to Mr. Moore.

Harris further testified that he had owned the Mercury, which he said he traded for the guns, for a little over three months, but that he did not remember the name of the party from whom he had purchased the 1955 car. He said, however, that when he bought the automobile he received the pink slip, signed by the owner and his wife, and the white registration slip with the car, and that he paid the sum of $18 for a license but never transferred the ownership of the automobile into his own name, even though at the time that he first possessed it he thought he would keep the car. He said that the Mercury was still registered in the name of the person from whom he bought it, and that he transferred the automobile to Larry DeCamp in the same way in which he had obtained it, that is, he just handed him the signed pink slip he received from the prior owner and his wife. It will be noted that, while appellant said he bought the Mercury for $125, he sold three of the guns which were stolen and three more guns, all of which he claimed to have gotten from DeCamp, for $75; if true, this indicated a rather substantial loss, but he did not

say that he tried to sell the weapons to anyone other than Mr. Moore when the latter offered only $75 for them.

The evidence at the trial also showed that, shortly after the burglary, Harris sold one of the other stolen guns to Robert Lee Stephans. At that time, he told Stephans that his wife had given him the weapon as a present, but he testified that he had given a "mini-bike" and $35 in cash for the shotgun; the trade by which he received that gun took place, he said, in back of the airport. He did not know the name of the party from whom he obtained the shotgun.

The evidence of the defendant relative to how he obtained the weapons is incredible. Such testimony, or even a failure to produce sufficient evidence to explain reasonably how the stolen property was obtained, would be sufficient in the circumstances to sustain a conviction for burglary (*People* v. *Davis, supra,* 235 Cal.App.2d 214; *People* v. *Ford,* 234 Cal. App.2d 480 [44 Cal.Rptr. 556]). The sale of stolen property for an inadequate price has been held to be sufficient corroborative evidence to support a burglary conviction. (*People* v. *Conrad,* 125 Cal.App.2d 184 [270 P.2d 31].)

The record is thus ample to sustain the appellant's conviction.

■ Counsel for Harris does, however, contend that the record is not adequate to support the finding of the jury that the crime was burglary of the first degree. In this connection, the mere fact that unloaded guns were stolen from the Ballantyn home does not establish the crime as burglary of the first degree. ■ Section 460 of the Penal Code states that a first degree crime of burglary is committed by one ". . . who while in the commission of . . . [a] burglary [of an inhabited dwelling house in the daytime or nighttime] arms himself with a deadly weapon, . . ." but this rule does not apply to a burglar who steals an unloaded firearm and carries it away (*People* v. *Black,* 73 Cal.App. 13, 29 [238 P. 374]). ■ Consequently, the first degree charge can only be supported upon the theory that the burglary of an inhabited dwelling house was committed during the nighttime. ■ The temporary absence of the inhabitants of a home does not cause an inhabited residence to lose its character as such. (*People* v. *Allard,* 99 Cal.App. 591, 592 [279 P. 182]; *People* v. *Tittle,* 258 Cal.App.2d 518, 524 [65 Cal.Rptr. 576]). ■ The only evidence in the record possibly indicating whether the burglary was committed at night or in the daytime was that of the witness Strickland given at the preliminary examina-

tion in the court below. At that time, Mr. Strickland, who was a friend and neighbor of Mr. Ballantyn and whose little girl fed the Ballantyn cats every day, said that he and his wife were awakened at about one o'clock in the morning of March 24th by a series of whistles. He looked out toward the Ballantyn house and saw several people walking near it and whistling as if giving a signal. The whistling did not constitute a tune, and the signals were repeated a number of times. The burglary was not discovered until late in the same day when the 8-year-old Strickland daughter went to feed the cats and reported to her father that some of the doors of the Ballantyn house were open. No one saw any person entering the house, and there was no testimony that the defendant Harris had ever been near the place. As the little girl fed the animals daily, the inference would follow that the burglary must have taken place during the night between March 23 and March 24, or during the day of March 24 when the doors were found open at the Ballantyn home.

The defendant was arraigned in the superior court May 23, 1967, and at that time his trial was set for July 12, 1967. For the first time on July 3, 1967, a subpoena was issued for Mr. Strickland, and on July 7, 1967, his house was visited five times by a member of the Modesto police force. On July 10th, an official process server also went to the home on two occasions. Six weeks had thus elapsed after the trial date was set during which the prosecution made no effort to see that Mr. Strickland would be available when the trial was held. The process server reported what he had done to the district attorney's office and that office, through him or by some other means, found that Strickland was supposed to be somewhere in Canada. It should be noted in passing that no evidence was adduced as to any of these matters; the showing depended wholly on counsel's statement; no opportunity was thus given to the defendant's lawyer to make inquiry by a witness as to what had been discovered about Mr. Strickland's absence or to contend that the information was incorrect.

In *People* v. *Dozier*, 236 Cal.App.2d 94, 100 [45 Cal.Rptr. 770], the court stated the rule that when a witness is not present because of the result of the negligence of the prosecution, the transcript of his testimony may not be used.

This question was thus discussed in *People* v. *Horn*, 225 Cal.App.2d 1, 4 [36 Cal.Rptr. 898] : "If there is satisfactory evidence that the missing witness is not within the state or deceased, no further preliminary showing is necessary to

justify a ruling that the recorded evidence given at the preliminary examination is admissible (*People* v. *Carswell,* 51 Cal.2d 602, 605 [335 P.2d 99]), but if neither one of these eventualities can be shown, it is necessary for the prosecution to prove 'due diligence' in its attempt to produce the missing witness at the trial as a preliminary condition to the reading of his testimony.''

In *People* v. *Casarez,* 263 Cal.App.2d 130 [69 Cal.Rptr. 187], which followed *Barber* v. *Page,* 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318], it is stated at pages 132-133: ''However, the United States Supreme Court has recently held that a mere showing the witness was absent from the jurisdiction (absent from the state) was not enough when the state knew his whereabouts. The state must also show that it made a good faith effort to obtain his presence at the trial (*Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318]). Significantly, the court stated at pages 723-724 [20 L.Ed.2d at pp. 259-260, 88 S.Ct. at p. 1321]:

'' 'We start with the fact that the State made absolutely no effort to obtain the presence of Woods at trial other than to ascertain that he was in a federal prison outside Oklahoma. It must be acknowledged that various courts and commentators have heretofore assumed that the mere absence of a witness from the jurisdiction was sufficient ground for dispensing with confrontation on the theory that ''it is impossible to compel his attendance, because the process of the trial Court is of no force without the jurisdiction, and the party desiring his testimony is therefore helpless.'' 5 Wigmore, Evidence § 1404 (3d ed. 1940).

'' 'Whatever may have been the accuracy of that theory at one time, it is clear that at the present time increased cooperation between the States themselves and between the States and the Federal Government have largely deprived it of any continuing validity in the criminal law.'

'' '. . . In short, a witness is not ''unavailable'' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. The State made no such effort here, and, so far as this record reveals, the sole reason why Woods was not present to testify in person was because the State did not attempt to seek his presence. The right of confrontation may not be dispensed with so lightly.'

''With this recent articulation of our highest court in mind, we must reverse the judgment in the instant case. The record

reveals the officers (and apparently the prosecutor) made absolutely no effort to secure Ross' presence at the defendant's trial once they learned he was in Chicago. The officers made no effort, by personal contact or otherwise, to persuade the witness to return to California nor did they seek the witness's attendance under the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings. And, significantly, the Uniform Act was in effect in both California and Illinois at the time of defendant's trial.''

In the recent case of *Barber* v. *Page, supra,* 390 U.S. 719, 725 [20 L.Ed.2d 255, 260, 88 S.Ct. 1318, 1322], Mr. Justice Marshall speaking for the court emphasized the importance of attempting to secure the attendance of witnesses at a criminal trial. He said that the right to confront witnesses as established by the Bill of Rights is basically a ''trial right,'' which gives the opportunity of the defendant at the hearing itself to cross-examine the witness and also affords an occasion for the jury to weigh the demeanor of the witness; it was pointed out that a preliminary hearing is ''a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.''

In *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], the court spoke of its commitment to preserve an essential guarantee of fairness, ''the right of cross-examination—against all encroachments'' no matter how innocuous they may seem on their face. The court said that protections had been formalized in the requirements of confrontation and cross-examination which find expression in the Sixth Amendment, and that the ''former testimony'' cases were instructive, even when the testimony was taken at a hearing in which the defendant had a complete and adequate opportunity to cross-examine with the assistance of counsel. The court stated that introduction of former testimony at a subsequent trial violates the constitutional right of confrontation if the witness's absence was due to the negligence of the prosecution (*Motes* v. *United States,* 178 U.S. 458 [44 L.Ed. 1150, 20 S.Ct. 993]), or its failure to make a timely and good faith effort to compel his attendance by various procedural means; in the *Johnson* case the court quotes from the *Barber* opinion, saying: '' 'The right of confrontation may not be dispensed with so lightly.' These rulings emphasize the high

court's belief in the importance of ensuring the defendant's right to conduct his cross-examination before a *contemporaneous* trier of fact, i.e., before the same trier who sits in judgment on the truth of the witness' direct testimony as it is spoken from the stand." (See also *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].)

The district attorney's office was not active in attempting to secure Mr. Strickland's presence at the trial in a timely fashion. If the prosecution had moved alertly after the setting of the case, it seems clear that it could have had the witness present at the trial, and it is for this reason that we feel that his evidence given at the preliminary examination was not properly introduced at the trial. However, *People* v. *Ford,* .60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892], points the way for us in this case. There is no doubt that the defendant was proven guilty of burglary, and the only effect of the exclusion of the Strickland testimony by way of what he said at the preliminary examination is that the degree of the burglary must be found to be burglary of the second degree. In *People* v. *Ford, supra,* 60 Cal.2d 772, 792, it is said: "Defendant contends that the evidence is legally insufficient to support the finding that the burglary was of the first degree. This point is well taken. Penal Code section 460, subdivision 1, declares that first degree burglary is that which is committed, *inter alia,* either 'in the nighttime' or by one who during the course thereof 'arms himself with a deadly weapon. . . .' As the Attorney General concedes there was no evidence that the burglary was committed in the nighttime or that Roope's gun was loaded when it was stolen; nor is there any evidence that defendant loaded the gun during the course of the burglary. In *People* v. *Black* (1925) 73 Cal.App. 13, 29 [7] [238 P. 374], it was held that a burglar who steals an unloaded revolver as part of his loot does not 'arm' himself with a 'deadly weapon,' as those terms are used in Penal Code section 460. As none of the other conditions of subdivision 1 of Penal Code section 460 were met in the case at bench, it appears that defendant could not properly have been convicted of more than second degree burglary. Such conclusion, however, does not require reversal of the burglary conviction, for the evidence is ample to establish that the crime of burglary as charged in Count I was committed and that it was defendant who committed it. Accordingly we rectify this error (under Pen. Code, § 1181, subd. 6) by directing that the judgment on Count I be modified to burglary of the second

degree, and, as so modified, affirmed, the cause in this respect to be remanded to the trial court with directions to arraign and sentence the defendant in compliance with this ruling. (*People* v. *Golembiewski* (1938) 25 Cal.App.2d 115, 118-119 [3] [76 P.2d 717].) ''

The error in admitting the testimony of Mr. Strickland given at the preliminary examination is remedied, as in the *Ford* case, *supra,* by the direction now given that the charge be modified to burglary of the second degree; as so modified the judgment is affirmed; the cause is remanded to the trial court with directions to arraign the defendant for judgment and sentence in compliance with this ruling.

Gargano, J., concurred.

A petition for a rehearing was denied October 30, 1968, and respondent's petition for a hearing by the Supreme Court was denied December 4, 1968.